**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| CHARLOTTE D. LACY<br><br>*Plaintiff,*<br><br>v.<br><br>EASTMAN CHEMICAL COMPANY, INC.<br><br>*Defendant.* | Jury Trial Demanded<br><br>Civil Action No.: _____ |

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND**

COMES NOW PLAINTIFF **CHARLOTTE D. LACY** complaining of Defendant **EASTMAN CHEMICAL COMPANY, INC**. and for cause of action would show the Court and jury as follows:

**A.  JURISDICTION AND VENUE**

1. The Court has subject matter jurisdiction over the lawsuit because the action arises under Title VII of the Civil Rights Act of 1964, as amended, for discrimination, hostile work environment and for retaliation for complaining to the employer under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*

2. This Court has supplemental jurisdiction over PLAINTIFF's state statutory causes of action arising out of the same case or controversy as the civil action over which this Court has original jurisdiction. 28 U.S.C. § 1367(a).

3. Venue exists in this district and division as detailed in 28 U.S.C. §1391.

**B.  EXHAUSTION OF ADMINISTRATIVE REMEDIES**

4. PLAINTIFF LACY filed a charge with the Equal Employment Opportunity Commission (EEOC) of discrimination (race and sex) and retaliation against the

Defendant. *See* Ex. 1, Charge of Discrimination. LACY files this complaint within 90 days after receiving a notice of right to sue from the EEOC. *See* Ex. 2, Notice of Right to Sue. All conditions precedent to the institution of this lawsuit have been fulfilled.

## C. PARTIES

5. PLAINTIFF CHARLOTTE D. LACY ("LACY" or "PLAINTIFF") is an individual who resides in Panola County.

6. DEFENDANT EASTMAN CHEMICAL COMPANY ("EASTMAN" or "DEFENDANT") is a Tennessee corporation doing business in Harrison County, Texas, and is headquartered in Kingsport, Tennessee, with its physical address located at 300 Kodak Blvd., Longview, Texas 75602. EASTMAN is an employer engaging in an industry affecting interstate commerce and employs more than 15 regular employees. EASTMAN can be served through its registered agent, Corporation Service Company, at 211 E. 7th Street, Suite 620, Austin, Texas, 78701-3218.

## D. MATERIAL FACTS

7. PLAINTIFF LACY is an African-American female who was hired by EASTMAN in November 2005 for the position of Chemical Operator ("Operator").

8. From early in her employment at EASTMAN until her termination (2008-2015), LACY was subjected to a hostile work environment to because of her sex (female) and race (African-American), as described below.

9. LACY reported the hostile work early on in her tenure to Sandra Angeles, a member of Human Resources in Kingsport, Tennessee, Global Business Conduct Manager regarding the hostile work environment and discrimination.

10. For example, EASTMAN's Operators had nude pictures of women openly taped onto company computers and instruments. LACY also endured EASTMAN employees openly using the terms h*es and b*tches to describe women, despite her requests that they stop, and despite her complaints to EASTMAN management and human resources.

11. EASTMAN Operator, Bobby Martin, sent LACY emails from EASTMAN computers of a sexually suggestive nature, such as what type of underwear was LACY wearing. LACY reported these emails her to Shift Supervisor and to the Global Business Conduct Manager in Kingsport, Tennessee. In addition, that same EASTMAN employee invited LACY to come outside and do sexual acts in one of the jobs analyzers houses; and he also intentionally put his hands on LACY's behind inappropriately and without LACY's consent. These events were reported to the Lead Operator.

12. LACY's fellow employee, Phil People (Lead, Safety/Maintenance), told her, "I'm going to get that p*ssy."

13. Even while eating, LACY could not be free of sexually suggestive banter. For example, while in the control room kitchen, Troy Gross (Lead Operator) sat in front of LACY while she was eating a banana and told her to "put the banana in your mouth slowly."

14. LACY also experienced the humiliation of having male Operators repeatedly and intentionally open the lady's bathroom door while she was inside changing clothes. Afterwards, the offenders would make comments indicating that they had

seen her use the facilities. An example would be Operators asking her, "What are you doing with those polka-dotted underwear?"

15. Throughout the years, LACY has been referred to as Aunt Jemima/Ancha Mama (a brand of pancake mix, syrup, and other breakfast foods, featuring a black woman attired with a head scarf) by the Lead Operator when she wore a red head band on her head; a mad black woman; a stripper; and a lesbian.

16. Operator Rick Foster would "remind" LACY that the only reasons EASTMAN hired her were that she is a female and Black.

17. Operator Rick Foster would also say in front of co-workers—including supervisors—that he believed that her hiring signaled that the men were about to get (stereotypically Black) foods cooked for them, including fried chicken, greens, and "that water bread that y'all be talking about."

18. LACY's gender was also a factor when it came to not being allowed to train new Operators. For example, she was once not permitted to train two new male Operators because they informed Supervisor David Russell that they did not want to train under a female, and they were moved to train under male Operators.

19. Male EASTMAN Operators would hit or grab each other in their private parts while in the presence of LACY. Some of the male Operators would also hump or hunch each other from behind (simulating sex acts) in front of the shift—including the Supervisor.

20. LACY frequently had EASTMAN employees outside of the protected class insult her about her hair weave extensions. A typical comment to LACY was, "Why are you wearing that horse hair?"

21. LACY also had comments made to her about her breasts by Nathan Crowe (Supervisor), including, "Are those boobies real?"

22. EASTMAN employees were involved in or aware of gossip of a sexual nature regarding LACY, including but not limited to, Operators, the Area Manager, the Director of HCC-4, and the Team Manager.

23. During a shutdown, a Maintenance Supervisor told an Engineer in the control room, in front of other employees, that he "could train a bunch of monkeys to do an Operator job."

24. EASTMAN's Environmental Safety Operator, C. Cooper (white male) exposed himself to LACY while he was urinating outside, and although he was aware of LACY's presence, he continued exposing himself in unabated urinating in front of LACY and two other male Operators.

25. LACY reported the urination event to Linda Hess (Production Human Resources) and Gary Bass (Maintenance Human Resources), but nothing was done to address the situation. In fact, it became a joke that spread throughout the building. Troy Moore (White male) told LACY, "You seen that and it got you hot, huh?"

26. LACY was treated less favorably than EASTMAN'S non-African-American, and male employees, in the terms and conditions of her employment, including but not limited to discipline.

27. For example, on June 18, 2013, EASTMAN disciplined LACY for a "near miss," on a document entitled "HCC4 Safety & Health Concerns Report," incorrectly locking out and tagging out (or LOTO) some valves.

28. The June 18, 2013 incident was LACY'S first time being disciplined at EASTMAN.

29. Despite this being LACY's first write-up, following a July 11, 2013 Disciplinary Review, EASTMAN issued LACY a Warning/Performance Improvement Plan ("PIP") on July 26, 2013.  The PIP required LACY to complete re-training and a 12-month probation (until July 11, 2014).

30. In an attempt to support this extreme discipline, EASTMAN incorrectly stated in LACY's PIP that she requested refresher training in all HCC-4 production areas. As a result, the PIP also wrongly stated that LACY requested to re-take the training that new hires must complete: Training on seven (7) jobs, with three (3) progressions, which each progression containing multiple on the job skill checks, self-studies and field demonstrations. It defies logic that (a) LACY voluntarily requested such re-training, which was entirely retaking "new hire" training, or (b) (as alleged) that even if she had requested a re-fresher, that a request for a "re-fresher" would be equated with a request to *entirely* retake "new hire" training.

31. The PIP also incorrectly stated that LACY "said her cell phone use was a distraction."  As a result, the PIP provided that LACY was to "keep her cell phone in her locker for the duration of the Warning period," and that she could "only use her cell phone during breaks and in the B74 break/kitchen area."  In addition, it provided that LACY "would not be eligible for a 2014 Comp Review increase or 2013 CIP, if paid." EASTMAN management essentially told LACY to accept the write-up, or be terminated.

32. Conversely, similarly situated employees outside of the protected class were given lesser discipline for nearly identical conduct (as well as more severe conduct).

33. While many different Operators made major mistakes at the EASTMAN plant, many were never written up, put on a Warning, lost their bonus, lost their cell phone privilege, or made to repeat all seven (7) job trainings the way LACY was required to do so.

34. For example, Jason McGregor (white male Operator) had many violations. This included tripping a boiler which caused a facility shutdown, causing a 600 gallon spill. The incident was so severe that the EASTMAN plant had to shut down, costing EASTMAN large amounts of money. On information and belief, Mr. McGregor received no punishment for this shutdown incident, and if he was disciplined, that discipline did not rise to the level given to LACY.

35. Similarly, Mark Howl (white male Operator), while pumping ethanol through a pump, had the valves lined up wrong, causing a major piece of equipment to freeze, which caused a plant upset at EASTMAN. On information and belief, Mr. Howl only received an undocumented warning.

36. Due to the discriminatory treatment, LACY asked to be transferred to another building, but was denied that request. This was despite the fact that a white female Operator (Jean Braheney) was allowed to transfer to another building, despite not completing the required re-training.

37. Despite EASTMAN's alleged commitment to safety, when LACY complained to Craig Schmidt (Area Manager, HCC-4 Olefin Department) about another Operator

creating safety issues in July 2014, she was called into the office (multiple times) and told to mind her own business.

38. The continued poor treatment of LACY by EASTMAN eventually took a physical toll on LACY. On March 31, 2015, LACY experienced chest pains and shortness of breath while at work as a result of the stress from her treatment by EASTMAN, requiring her to leave work to receive medical treatment, resulting in her being admitted to the hospital.

39. In early May 2015, PLAINTIFF complained to Linda Hess (Human Resources) about the different and more severe discipline that she received (after only one mistake), while no actions had been or were being taken against other Operators for a multitude of other errors that she noticed. LACY complained that the difference in discipline was due to either being female or African-American.

40. On May 29, 2015, Mr. McGregor was involved in another event at EASTMAN, when a steam drum he was operating over-pressured resulting in another Operator receiving severe burn injuries.

41. LACY witnessed the Operator being burned. She was interviewed about the incident. LACY informed her supervisor, David Russell, that the Operator had followed the correct procedures, and that Jason McGregor's actions caused the incident.

42. Moments after LACY witnessed the Operator being burned, David Russell told LACY that "Randy Conway [Director, GLBL PROC. SAF-Natural RES MGMT-C] wants to speak with you to see how your progression is doing."

43. Also on May 29, 2015, LACY was presented with a Separation Agreement (the same day that the employee was burned) in a meeting attended by Keith Kelly (Area Manager, HCC-4), Craig Schmidt, and Linda Hess (Human Resources), if she volunteered to quit her employment. *See* Ex. 3, Separation Agreement: Release and Waiver.

44. LACY was given the week off from work to consider the terms of the Separation Agreement.

45. LACY rejected the terms and returned to work on June 8, 2015. That same day, LACY was instructed to perform a water pump lockout. LACY double-checked with both in inside Operator (Scott Haley) as well as the Acting Supervisor (Bill Stone) on what to do, as she was performing the work. However, LACY was written up for allegedly doing the lockout/tagout incorrectly despite double-checking the instructions.

46. On June 9-10, 2015, LACY complained to Gary Bass (Maintenance Human Resources) about a white male who was harassing her about her hair by saying, "When are you going to take that horse hair out your head?"

47. On June 10, 2015, an HCC-4 Safety and Health Concerns Report (near miss) was written on the June 8, 2015 water pump lockout.

48. On June 11, 2015, LACY complained to Acting Supervisor Bill Stone about another white female that informed LACY that she was being harassed because of her weight.

49. Also on June 11, 2015, LACY was terminated, allegedly for incorrectly performing the water tank lockout on June 8, 2015.

50. LACY has attempted to mitigate her damages, seeking similar employment.

51. LACY eventually started work at Walmart in March 2016. She is earning approximately $23.60 less per hour that her salary with EASTMAN.

### E. COUNT 1– RACE DISCRIMINATION, SEX DISCRIMINATION AND RETALIATION UNDER TITLE VII

52. LACY incorporates by reference each of the facts alleged in paragraphs 1 through 51 as if fully stated herein.

53. LACY was an employee within the meaning of the Title VII and belongs to the class of employees protected under the statute, namely, female and African-American.

54. DEFENDANT is an employer within the meaning of the Title VII.

55. LACY was qualified for her position.

56. LACY suffered adverse employment actions.

57. LACY was treated less favorably because of her membership in her protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances.

58. LACY's job performance was always satisfactory or better at all times relevant herein.

59. DEFENDANT's actions demonstrate that it has engaged in racial and sex discrimination, and retaliatory practices, with malice or with reckless indifference to LACY's protected rights and is in violation of Title VII of the Civil Rights Act.

60. DEFENDANT, as alleged herein, discriminated against LACY on account of her race and sex as follows: Termination of employment; wrongful discipline.

61. LACY complained of this discrimination as outlined in the paragraphs above.

62. Because of LACY'S complaint regarding the discriminatory manner in which she was treated during her employment with DEFENDANT, LACY was then made a victim of retaliation.  This retaliation against LACY was demonstrated in her being disciplined more harshly and severely than others outside the protected class in nearly identical circumstances (including others who committed more severe offenses); and further, by her ultimately being asked to resign via a Separation Agreement that she subsequently refused, and her write-up and termination (based on alleged policy violations) in close proximity to her complaints.

63. Such discrimination and retaliation have caused LACY to suffer damages of severe emotional distress, lost wages, including lost raises, retirement benefits, loss of promotion, and other benefits associated, as LACY has been subjected to adverse employment actions as a result of the discrimination and retaliation.  Such discrimination and retaliation was committed with malice and reckless indifference to the rights of LACY who endured discrimination, opposed such, and reported discriminatory behavior and desire to be treated equally pursuant to the intent of the statute to protect victims from such actions.

64. LACY has been denied opportunities to which she was entitled and such benefits and privileges that she would have received if she had not been intentionally discriminated and retaliated against by DEFENDANT. LACY is now suffering and will continue to suffer past and future pecuniary losses, emotional and physical pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses. These irreparable injuries and monetary damages are

the result of DEFENDANT's retaliatory practices and she will continue unless and until this Court grants relief.

65. In bringing this action, LACY has been required to retain the services of counsel and she is, therefore, entitled to an award of attorney fees.

### F.  COUNT NO. 2-RACIAL DISCRIMINATION, HOSTILE WORK ENVIRONMENT AND RETALIATION UNDER RECONSTRUCTION CIVIL RIGHTS ACTS, 42 U.S.C. § 1981

66. LACY repeats and re-alleges paragraphs 1 through 65, with the same force and effect as though fully set forth herein.

67. DEFENDANT's intentional racial discrimination against LACY as well as the pattern and practice of this are in violation of the Reconstruction Civil Rights Acts, 42 U.S.C. § 1981.

68. DEFENDANT's retaliation against LACY as well as the pattern and practice of this are in violation of the Reconstruction Civil Rights Acts, 42 U.S.C. § 1981 as well.

69. DEFENDANT's intentional hostile work environment in which LACY was forced to work as well as the pattern and practice of this are in violation of the Reconstruction Civil Rights Acts, 42 U.S.C. § 1981.

70. Such discrimination, hostile work environment and retaliation have caused LACY to suffer damages of severe emotional distress, lost wages, including lost raises, retirement benefits, loss of promotion, and other benefits associated as LACY has been subjected to adverse employment actions as a result of the discrimination and retaliation.

71. Such discrimination, hostile work environment and retaliation were committed with malice and reckless indifference to the rights of LACY and other

racial minorities to "have the same right…to make and enforce contracts… as is enjoyed by other citizens" and to the intent of the statute to protect victims from unequal treatment. Such malicious or reckless indifference warrants an award, *inter alia*, of compensatory and punitive damages, as are authorized by law for 42 U.S.C. § 1981 violations.

72. In bringing this action, LACY has been required to retain the services of counsel and she is, therefore, entitled to an award of attorney fees.

### G. COUNT NO. 3-HOSTILE WORK ENVIRONMENT UNDER TITLE VII OF THE CIVIL RIGHTS ACT

73. LACY repeats and re-alleges paragraphs 1 through 72 with the same force and effect as though fully set forth herein.

74. DEFENDANT has an obligation under the law to assure an environment free from harassment on the basis of race and sex.

75. DEFENDANT, as alleged herein, knowingly created and/or maintained a hostile work environment on the basis of race and sex. DEFENDANT, by and through its managers, supervisors, directors and vice principals, either knew about the hostile work environment and failed to take remedial action or themselves created a hostile work environment based on race and sex.

76. LACY was subjected to a hostile work environment based upon her race and sex. She belongs to two protected classes, as an African American who is female, was subject to unwelcome harassment, the harassment was based upon her membership in the protected classes, the harassment affected a term, condition or privilege of her employment and DEFENDANT knew or should have known of the harassment and failed to take prompt remedial action.

77. Prior to LACY's complaints of discrimination, it was evident that EASTMAN exhibited a different standard of treatment toward non-African American and male employees.  Examples include the demeaning, derogatory terms used to describe females, and the more lenient discipline shown to members outside of the protected class, with supervisors and managers being aware of such past instances.

78. The facts demonstrating that LACY was subjected to a hostile work environment based on race (African American) and sex (female), include the following: LACY is an African American female. The managers and supervisors exhibited a different standard of treatment toward non-African American and female employees in the work environment, and regarding discipline.  This harassment affected a term, condition, or privilege of LACY's employment, in that it was sufficiently severe or pervasive to create a work environment that is both subjectively and objectively abusive, *i.e.*, one that LACY perceived as abusive and one that a reasonable person would find hostile or abusive.

79. In doing the acts set forth above, DEFENDANT acted intentionally, and with a conscious disregard of LACY's right to work in an environment free from racial and sex hostility. DEFENDANT has acted, and continue to act, with a reckless disregard of its obligations under the law. The DEFENDANT's conduct, as alleged herein, was and is despicable, malicious and oppressive. LACY is therefore entitled to an award of punitive damages in an amount to be proven at the time of trial.

80. In bringing this action, PLAINTIFF has been required to retain the services of counsel and she is, therefore, entitled to an award of attorney fees.

## H.  DEMAND FOR JURY TRIAL

80.	PLAINTIFF hereby requests a jury trial for all claims.

### I.   PRAYER FOR RELIEF

81. Wherefore, PLAINTIFF prays that the Court grant her the following relief:

   a. Compensatory damages;

   b. Back pay to the date of trial;

   c. Front pay;

   d. Damages for mental pain and suffering;

   e. Reasonable attorneys' fees;

   f. Costs of suit;

   g. Punitive damages;

   h. Injunctive relief;

   i. Expert Fees;

   j. Pre-judgment interest at the highest rate allowed by law;

   k. Post-judgment interest at the highest rate allowed by law;

   l. Such other relief as the Court deems just and reasonable.


RESPECTFULLY SUBMITTED,

_____
Frederick J. Barrow
State Bar No. 24036189
fbarrow@staffordbarrow.com
Paul K. Stafford
State Bar No. 00791716
pstafford@staffordbarrow.com
**STAFFORD BARROW, PLLC**
400 N. St. Paul St., Ste. 1100
Dallas, Texas 75201
(214) 306-0977  - TEL

(214) 206-9445 – FAX